UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RECEIVED

FEB - 5 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

MARLIN DAVIS                              :
REG. NO. 30704-004                        :
FEDERAL CORRECTIONAL INSTITUTION :
100 PRISON ROAD                           :
ESTILL, SC. 29918                         :
                    Plaintiff,            :
                                          :
v.                                        :    Civil Action No. 06-1698 (CKK)
                                          :
FEDERAL BUREAU OF PRISONS,                :
320 FIRST STREET, NW                      :
WASHINGTON, D.C. 20534                    :
                    Defendant,            :
                                          :
UNITED STATES PROBATION OFFICE            :
NORTHERN DISTRICT OF FLORIDA              :
111 N. ADAMS ST, SUITE 100                :
TALLAHASSEE, FL 32301-7730                :
                    Defendant.            :
_____ :

**PLAINTIFF'S RESPONSE TO MOTION TO DISMISS
OR SUMMARY JUDGMENT**

Plaintiff seeks relief under 5 U.S.C. § 552a (e)(5), (g)(1)(C), (g)(1)(D), and the

Fifth Amendment of the United States Constitution as to require compliance with the due

process standards of fairness, from the continued reliance on inaccurate information

contained in Plaintiff's PSI. The continued reliance on the inaccurate PSI by the BOP in

determining security and custody classification, (see Smith Dec. at ¶ 6 and 7), violates

plaintiff's constitutional rights.

Defendants argue for Dismissal or Summary Judgment, not on the grounds that Plaintiff has failed to state a claim or that there is no genuine issue of fact before this Court. Defendants allege five grounds to support Dismissal o Summary Judgment as follows:

1. Privacy Act Remedy Cannot be Used to Collaterally Attack Computation of Plaintiff's Sentence

2. Venue for Plaintiff's Habeas Claim Is Improper in the District of Columbia

3. The BOP is exempt from the record-amendment requirements of Section (d) of the Privacy Act.

4. The BOP has complied with 5 U.S.C. §552a (e)(5) by providing a fair opportunity to plaintiff to present his contentions about the PSR in his file.

5. Statute of Limitations

A party moving for dismissal under Federal Rule of Civil Procedure 12(b)(6), has the burden of proving that the nonmovant has failed to state a claim upon which relief can be granted. To prevail, the movant must show "beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim [that] would entitle him to relief." *Cloney v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99 2 L. Ed. 2d 80 (1957); *accord Chandler v. D.C. Dept of Corrections*, 145 F.3d 1355, 1360 (D.C. Cir. 1988); *see also Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed 2d 55 (1984).

In determining a motion for summary judgment, the Court must view the evidence in favor of the nonmoving party and give benefit of all reasonable inferences drawn from the nonmoving party's evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986). As a general rule, "[i]n deciding whether there is a genuine issue of fact before it, the Court must assume the truth of all

2

statements proffered by the party opposing summary judgment." *Green v. Dalton*, 164

F.3d 671, 674 (D.C. Cir. 1999).

1. **Privacy Act Remedy Cannot be Used to Collaterally Attack Computation of Plaintiff's Sentence**

Defendants citing Complaint at Appendix A alleges "Plaintiff's real challenge in

this case is to the conclusion of the PSR that plaintiff engaged in distributing multiple

kilograms of cocaine base (more than 1.5 K), resulting in the sentence imposed on

him, and BOP's subsequent determination of his security classification, quarters

assignment and ultimately length of his sentence."

The document referred to by defendants is a Request for Administrative Remedy,

where "Administrative Remedy is requested to correct the unresolved/incorrect

paragraphs listed in my Presentence Report."

Plaintiff never requested administrative remedy to correct his sentence. A habeas

claim is employed to contest imprisonment or duration of detention. The Supreme Court

has defined a habeas claim as one that affects "the length of imprisonment." *Preiser v.*

*Rodriguez*, 411 U.S. 475, 500, 93 S.Ct. 1827, 1840-41, 36 L. Ed. 2d 439 (1973).

To bring a claim under § 552a (g)(1)(C) Plaintiff must show that:

> (1) he has been aggrieved by an adverse determination; (2) the BOP
> failed to maintain his records with the degree of accuracy necessary
> to assure fairness in the determination; (3) the agency's reliance on
> the inaccurate records was the proximate cause of the adverse
> determination.

*Deters v. U.S. Parole Comm'n*, 85 F.3d 655, 657 (D.C. Cir. 1996)(emphasis added).

In the Answer to Complaint filed 12/4/06, Defendants admit that, "Plaintiff has

exhausted his Administrative Remedies seeking verification of the inaccurate paragraphs

contained in his PSR." Complaint at 3. See also Declaration of Bruce Smith (As I

understand it, the issue raised by Mr. Davis in his complaint resolves specifically around the category of "severity of offense.") at 4.

### 2.    Venue for Plaintiff's Habeas Claim is Improper in the District of Columbia

Defendants assert that "venue for plaintiff's habeas claim is improper in the District of Columbia." Motion at 7. Plaintiff's Complaint is not a habeas claim and a Privacy Act claim is properly venued in the District of Columbia.

The Ninth Circuit has held that to state a claim under the Privacy Act, a plaintiff must allege:

> "1) that the government failed to fulfill its record keeping obligation, 2) which failure proximately caused the adverse determination, 3) that the agency failed intentionally or willfully to maintain the records, and 4) that plaintiff suffered actual damages."

Rose v. United States, 905 F.2d 1257, 1259 (9th Cir 1990).

The Ninth Circuit's Formulation has been followed by the D.C. Circuit in *Deters v. United States Parole Comm'n. Id.*

### 3.    The BOP is exempt from the record-amendment requirements of Section (d) of the Privacy Act

The Privacy Act authorized agencies to exempt from its access and amendment provisions all systems of records consisting of "investigatory material compiled for law enforcement purpose." Subsection (j)(2) empowers law enforcement agencies to exempt form subsection (d) certain types of criminal records systems, including those consisting of "information compiled for the purpose of a criminal investigation...and associated with an identifiable individual," 5 U.S.C. § 552a (j)(2).

4

The Court of Appeals in *Doe v. FBI*, 936 F.2d 1346, 1352 (D.C. Cir 1991), was presented with the problem of providing a method by which the FBI could protect exempt records which were contained in non-exempt files. The court stated, "The critical question then, is whether the FBI's investigatory information on Doe lost its exempt status when it was subsequently used, in altered form, for a non-law enforcement purpose."

The Court held in order to qualify for exemption pursuant to § 552a (j)(2) a record must satisfy two criteria:

> "First, 'the agency's investigatory activities that gives rise to the document sought must be related to the enforcement of federal laws...'" Id. (quoting *Prat v. Webster*, 673 F.2d 408, 420 (D.C. Cir 1982)). To make this showing, the agency "must demonstrate a connection between its investigation and the existence of a 'possible security risk or violation of federal law.' Id. (quoting *Prat*, 673 F.2d at 420). "Second 'the nexus between the investigation and one of the agency's law enforcement duties must be based on information sufficient to support at least 'a colorable claim' of its rationality.'"

*Id. (quoting Pratt, 673 F.2d at 421).*

Defendants have not demonstrated a connection between verifying and amending the PSR and the existence of a "possible security risk or violation of federal law," and therefore, should not qualify for exemption.

Furthermore the exemptions claimed by the BOP to its Inmate Central Record System applies only to, 5 U.S.C. § 552a (e)(1) and (e)(5). See 28 C.F.R. § 16.97 (a)(4), (j). These exemptions apply only to the extent,

> where it may be appropriate to permit individuals to contest the accuracy of the information collected, e.g. public source materials, or those supplied by third parties.

28 C.F.R. § 16.97 (a)(4), (k).

The BOP has also enacted internal procedures to facilitate inmate's access to inmate central file and challenge the accuracy of the information contained in the inmate's records in accordance with 28 C.F.R. § 16.97 (a)(4),(k).  See Exhibit #1.

Defendants argument cannot stand that "the Inmate Central Records System is exempt from subsections (d), (e)(5) and (g) of the Privacy Act.  See 28 C.F.R. § 16.97 (a)(4), (j)."  Memorandum at 8.

28 C.F.R. § 16.97 (a)(4), (j) , is inapplicable to the access and amendment exemptions of subsection (d), and to the civil remedies exemption of subsection (g).

The specified provisions promulgated by 28 C.F.R. § (a)(4), (j), are subsections (e)(1) and (e)(5) of the Privacy Act.  Subsections (d) and (g), were not promulgated, which would be required to give them effect.

In support of their argument, defendants claim under *White v. United States Probation Office*, 148 F.3d 1124, 1125 (D.C. Cir. 1998), "the injunctive relief Plaintiff demands, amendment of the PSI maintained in the BOP's Inmate Central Record System, is not available." *Id.*

In *White*, the Court *citing Deters v. U.S. Parole Comm'n*, 85 F.3d 655 and *Sellers v. Bureau of Prisons*, 959 F.2d 307, 309-10 (D.C. Cir. 1992), held that *White* was not entitled to relief because he did not allege that there are "inaccurate factual statements in the presentence report."  Plaintiff seeks "verification and amendment of inaccurate factual paragraphs contained in his presentence report."

6

4.    **The BOP has complied with 5 U.S.C. § 552a (e)(5) by providing a fair opportunity to plaintiff to present his contentions about the PSR in his file**

Defendants concede "they have an obligation to undertake efforts to maintain accurate records." Memorandum at 9.

Defendants contend that "the BOP considered Plaintiff's contentions concerning the alleged inaccuracies in his file, but his allegations were contradicted by the government's evidence regarding the amount of drugs which could have reasonably been attributed to him." *Id.* at 10.

Defendants offer no evidence to support this statement. Plaintiff has offered as proof in his Complaint excerpts of the government's evidence as it applies to the inaccurate paragraphs used by the BOP; and it does not contradict Plaintiff's allegations. Complaint at 4 thru 6. See also Exhibit #2.

Defendants state "the United States Parole Commission has promulgated regulation exempting its system of inmates records." *Id.* at 10. Plaintiff has not included the United States Parole Commission in his complaint.

Defendants claim USPO procedures do not allow for changes or addendums, *Id* at 11, quoting P.S. 5800.11, but offer no proof or argument to support that the United States Probation Office has promulgated regulations exempting its system of records from the Privacy Act's amendment provisions.[1]

Defendants also argue that "noting an inmates challenge to information has been held to satisfy the Privacy Act's obligation. *Id* at 11.

---

[1] Leave is requested to respond in the event Defendants offer argument to support this claim.

The Court of Appeals for the District of Columbia in *Sellers v. Bureau of Prisons*, 959 F.2d 307 (D.C. Cir. 1992), ruled that "as long as the information contained in an agency's files is capable of being verified, then, under sections (e)(5) and (g)(1)(C) of the Act, the agency must take reasonable steps to maintain the accuracy of the information to assure fairness to the individual."

The BOP continues to use the inaccurate information contained in Plaintiff's PSR willfully. Plaintiff has made Administrative Requests, to the BOP's Regional Director and General Counsel, both offices choose not to ask the USPO to verify the accuracy of the PSR and willfully chose to continue its use.

At the institutional level the Mr. Smith, asked the USPO to resolve the matter. The USPO, instead diverted to the actions of the sentencing judge and the 11th Court of Appeals. The information in the PSR can easily be verified from Trial Transcripts. See Exhibit #2.

### 5. Statute of Limitations

Plaintiff filed the instant complaint on September 29, 2006, after exhausting his Administrative Remedies. Plaintiff did not know the Bureau of Prisons used drug amounts to determine security level, and custody classifications until on or about January 15, 2006, after reviewing his PSR and saw the underlined drug amounts and asked Mr. Smith the purpose.[2] *Tijerina v. Walters*, 821 F.2d 789, 798 (D.C. Cir1987)(in a normal Privacy Act Claim, the cause of action does not arise and the statute of limitations does not begin to run until the plaintiff knows or should of known of the alleged violation).

---

[2] Included with Plaintiff's response, is a Request for Certification or Judicial Notice Of Presentence Report and/or Statement of Reasons. This allows Plaintiff to submit the PSR for the to the court as evidence.

Pursuant to the Privacy Act, the applicable statute of limitations did not begin to run until on or about January 15, 2006, well within the Act's two year statute of limitations.

## CONCLUSION

Therefore, Defendant's Motion pursuant to Federal Rule of Civil Procedure 12(b)(1) or Rule 56 should be denied.

Respectfully submitted,

Marlin Davis, Pro Se
Reg. No. 30704-004
Federal Correctional Institution
100 Prison Road
Estill, SC 29918

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by first class United States mail to: Rhonda C. Fields, United States Attorney's Office, Judiciary Center Building, 555 4th Street, N.W., Room E4804, Washington D.C. 20530.

Marlin Davis, Pro Se

9

# EXHIBIT
# #1

c.  <u>Release of Information to Members of Congress</u>.  Information contained in systems of records maintained by the Department of Justice, not otherwise required to be released pursuant to 5 U.S.C. 552 may be made available to a Member of Congress or staff acting upon the Member's behalf when the Member or staff requests the information on behalf of and at the request of the individual who is the subject of the record.

d.  <u>Release of Information to the National Archives and Records Administration</u>.  A record from a system of records may be disclosed as a routine use to the National Archives and Records Administration (NARA) in records management inspections conducted under the authority of 44 U.S.C. 2904 and 2906.

14.  <u>DISCLOSURE OF INMATE CENTRAL FILE MATERIAL</u>.  The Privacy Act of 1974 sets forth a series of requirements governing federal agency record-keeping practices intended to safeguard individuals against invasions of personal privacy.  The Act forbids release of information from agency records without a written request by, or without the prior written consent of, the individual to whom the record pertains, except in specific instances as described in the Act.  Civil sanctions and criminal penalties are prescribed for violation of the provisions of the Privacy Act.

It is, therefore, imperative that each Bureau employee be knowledgeable of this Act's provisions, and conform his or her conduct to the Act regarding the maintenance of records and the release of information contained in those records.  The Program Statement on Release of Information establishes procedures for the release of requested records in the possession of the Bureau.

15.  <u>INMATE REVIEW OF INMATE CENTRAL FILE</u>.  An inmate has the option to look at materials maintained in his/her Inmate Central File.  This procedure is not required by either the Freedom of Information Act or Privacy Act.  A request submitted under FOIA, for example, is processed formally under Department of Justice and Bureau guidelines for handling such requests, in light of the specific statutory provisions.  By contrast, the information contained in this section establishes an administrative procedure for inmate access to records which can properly be shown to the inmate in accordance with sound correctional practices and concerns.

a.  <u>Local Procedures</u>.  Each institution and facility shall issue local instructions to implement this section.  Local procedures shall include but are not limited to those items listed in Section 15.a. and 15.b. of this Program Statement.  Each Chief Executive Officer (CEO) shall decide on the expeditious and efficient means to accomplish any necessary file review.  The CEO must designate those staff who are responsible for the:

PS 5800.11
September 8, 1997
Page 19

(1) initial review of all current files of the inmate population;

(2) receipt of inmate requests to review files, and the monitoring of the inmate review of files; and

(3) screening of all records and documents in the future as they are sent to the Inmate Central File for filing.

Each institution may adopt its own procedures and forms for submitting and acknowledging requests and for logging and scheduling Inmate Central File reviews.

b. <u>Inmate Request and Review</u>. Any inmate seeking to look at his/her Inmate Central File shall submit a request to a staff member, as designated in the local instruction.

• The inmate's request should be acknowledged.
• The inmate should be permitted to review the file whenever practicable.
• All file reviews must be done under constant and direct staff supervision.
• Those materials which have been determined to be non-disclosable shall be removed from the folder before inmate review.
• An entry shall be made on the Inmate Activity Record (BP-381) to show the date the inmate reviews the file. The staff member monitoring the review shall initial the entry and the inmate shall be asked to initial it.

c. <u>Inmate Challenge to Information</u>. An inmate may challenge the accuracy of the information in his or her Inmate Central File. Unit team staff shall take reasonable steps to ensure the accuracy of challenged information, particularly when that information is capable of being verified. The inmate is required to provide staff with sufficient information in support of a challenge (names of persons to contact, government agency, etc...).

When an inmate provides such information, staff shall review the alleged error(s) and take reasonable steps to ensure the information is correct.

For example, if an inmate challenges information in the Presentence Investigation Report (PSI), staff should inform the appropriate U.S. Probation Office (USPO) in writing of the disputed information, and request that a written response also be provided. **USPO procedures, however, do not allow for changes or addendums to be made to the Presentence Investigation Report after sentencing since it is a court document.**

If the USPO subsequently reports that the challenged information, or some part thereof is not accurate, staff shall attach the Bureau's inquiry and the USPO response to the

PS 5800.11
September 8, 1997
Page 20

applicable section of the Inmate Central file, and also make a notation on the Inmate Activity Record form (BP-381) to ensure that future decisions affecting the inmate are not based on the discredited information.

When the USPO verifies that the information in the PSI is indeed inaccurate, as claimed by the inmate, staff should subsequently review, and where indicated, correct Bureau generated reports or data such as the Inmate Load and Security Designation form (BP-337), the Custody Classification form (BP-338), Progress Report, and any other reports that may have been based on the PSI. Bureau reports, data, or SENTRY transactions should be corrected within a reasonable period of time after identification as being inaccurate.

If the information source will provide a corrected document or data, it should be immediately inserted in the file or data base and the inaccurate information or document removed. A notation on the Inmate Activity Record form should acknowledge the insertion of the corrected information or document.

d. <u>Inmate Copies</u>. Any inmate who wishes to receive copies of disclosable materials from the file shall submit a request to institution staff. Within a reasonable time after the request, institution staff shall provide the inmate copies of requested disclosable documents maintained in the Inmate Central File. Fees for the copies are to be calculated in accordance with the Program Statement on Release of Information.

e. <u>Privacy Folder</u>. Records which have been determined, under separately issued guidelines, to be excluded from inmate review shall be placed in the Privacy Folder. Normally, actual placement of documents in the Inmate Central File is the Unit Secretary's responsibility. The Privacy Folder shall be placed on top of section 5 in the Inmate Central File.

As materials from any source are submitted for placement in the Inmate Central File, they are routed to an appropriate staff member the Warden designated. The Case Manager shall review the materials, to ascertain whether to place them in the regular sections, the Privacy Folder, or discard them. Any document to be excluded from inmate review must be stamped "FOI EXEMPT". At each Program Review and before an inmate reviews his/her Inmate Central File, the Case Manager shall review the file to ensure the proper location of forms and purge outdated or unnecessary forms and/or documentation.

f. <u>Parole Files</u>. Parole Mini-files, examiner packets, and pre-hearing assessments are not disclosable unless specifically authorized by the U.S. Parole Commission. The Parole Mini-file and other hearing materials must be removed from the Inmate Central File prior to inmate review. The inmate may seek review

EXHIBIT
#2



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION



THE UNITED STATES OF AMERICA,

        Plaintiff,

vs.

                          TALLAHASSEE CRIMINAL
                          92-04013

EMERSON O. DAVIS,
    a/k/a Mercy,
    a/k/a John Calvin,
    a/k/a Dred,
    a/k/a Stanford Robinson, and
MARLIN DAVIS,
    a/k/a Marlin Oliver,
    a/k/a Boliver D. Oliver,
    a/k/a Marlin Dalton,
    a/k/a Dalton Oliver,
    a/k/a Darryl Dalton

        Defendants.
_____/

COPY

TRANSCRIPT OF THIRD DAY OF TRIAL

      The above-entitled matter came on to be heard before

the Honorable WILLIAM STAFFORD, United States District Judge,

in the United States Courthouse, Tallahassee, Florida, on the

29th day of February, 1996, commencing at 8:46 a.m.

# W. PAUL RAYBORN

## UNITED STATES COURT REPORTER

P.O. BOX 10195

TALLAHASSEE, FLORIDA 32302-2195

(904) 224-7642

Matthews - Direct                                        155

1 night, you know.  I don't -- I didn't see no weapons.

2 Q    Did Mercy ever store or leave any drugs with this woman

3 you had mentioned earlier, Michelle?

4 A    Michelle?  The one who rent the cars?

5 Q    Right.

6 A    One time we had incident over there.

7 Q    Let's hear about that incident.

8 A    Where we -- he left some dope over there, right.

9          MR. JANSEN:  Judge, if we could get some time frame

10 on this?

11          MR. KIRWIN:  Okay.

12 BY MR. KIRWIN:

13 Q    Do you remember when that was?

14 A    Not precisely.

15 Q    Okay.  Was he dating this Michelle at the time?

16 A    Michelle, yeah, Michelle and a couple more persons,

17 Michelle, too.

18 Q    Okay.  And this happened during the time that -- that he

19 was dating Michelle?

20 A    Yes.  And all during this time, that was mainly the time

21 when her so-called sister was renting the cars for us.

22 Q    Okay.

23 A    He asked her to put some dope over there.

24 Q    He asked who?

25 A    Michelle.  Mercy asked Michelle to keep some dope in

1   there.  He definitely -- I knew about it.

2   Q    Okay.

3   A    We came back from Marianna, this chick was missing.

4   Q    Michelle?

5   A    Michelle.

6         MR. JANSEN:  Judge, I want to ask if we can at least

7   get a year?

8         MR. KIRWIN:  Your Honor, Michelle Kennedy is gonna be

9   a witness and will give us the time frame of when see she was

10  dating Emerson Davis.  We can narrow it down.

11        THE COURT:  All right.

12        MR. JANSEN:  Judge, the problem is, I'm gonna have to

13  cross-examine this individual.

14        THE COURT:  Do you know approximately when it was?

15        THE WITNESS:  Not precisely.

16        THE COURT:  Give us a time frame.

17        THE WITNESS:  The year, I would say '91, somewhere

18  '91.

19        THE COURT:  '91.  Okay.

20  BY MR. KIRWIN:

21  Q    Did y'all try and get the cocaine back?  You came back

22  from Marianna and she was gone, Michelle?

23  A    Yeah.

24  Q    What did you do?

25  A    Well, it was all up to Mercy because it was his dope.



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


THE UNITED STATES OF AMERICA,

            Plaintiff,

vs.
                                TALLAHASSEE CRIMINAL
                                92-04013
EMERSON O. DAVIS,
    a/k/a Mercy,
    a/k/a John Calvin,
    a/k/a Dred,
    a/k/a Stanford Robinson, and
MARLIN DAVIS,
    a/k/a Marlin Oliver,
    a/k/a Boliver D. Oliver,
    a/k/a Marlin Dalton,           
    a/k/a Dalton Oliver,
    a/k/a Darryl Dalton

            Defendants.
_____/


<u>TRANSCRIPT OF SIXTH DAY OF TRIAL</u>


      The above-entitled matter came on to be heard before

the Honorable WILLIAM STAFFORD, United States District Judge,

in the United States Courthouse, Tallahassee, Florida, on the

5th day of March, 1996, commencing at 8:59 a.m.

# W. PAUL RAYBORN

## UNITED STATES COURT REPORTER

### P.O. BOX 10195

### TALLAHASSEE, FLORIDA 32302-2195

### (904) 224-7642

1  Q    And you put it under your shirt for what reason?

2  A    Because he told me to.

3  Q    Now, you mentioned there was another occasion.  Did you

4  ever store any drugs for Emerson Davis?

5  A    Yes.

6  Q    Can you tell us about that, please?

7  A    He was going out of town.  He didn't want to take the

8  drugs.  He asked me if I would keep it, I said yes.

9  Q    Okay.  How was he going out of town?

10 A    I took him to the airport.

11 Q    To the airport?

12 A    Yes.

13 Q    Okay.  And he didn't want to take the drugs on the

14 airplane?

15 A    No.

16 Q    Where did you -- what did you do with -- well, first of

17 all, how did you get the drugs?

18 A    He brought it to me.

19 Q    And what did you do with the drugs?

20 A    I put -- we put it up under the bed.

21 Q    When you say "we," what do you mean?

22 A    Me and Emerson.

23 Q    Okay.  And under the bed where?

24 A    The mattress was cut, and he placed it underneath the

25 bottom of the mattress, inside of it.



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


THE UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                      TALLAHASSEE CRIMINAL
                                         92-04013
EMERSON O. DAVIS,
    a/k/a Mercy,
    a/k/a John Calvin,
    a/k/a Dred,
    a/k/a Stanford Robinson, and
MARLIN DAVIS,
    a/k/a Marlin Oliver,
    a/k/a Boliver D. Oliver,
    a/k/a Marlin Dalton,          
    a/k/a Dalton Oliver,
    a/k/a Darryl Dalton

        Defendants.
_____/


### TRANSCRIPT OF SIXTH DAY OF TRIAL


The above-entitled matter came on to be heard before

the Honorable WILLIAM STAFFORD, United States District Judge,

in the United States Courthouse, Tallahassee, Florida, on the

5th day of March, 1996, commencing at 8:59 a.m.

---

# W. PAUL RAYBORN

## UNITED STATES COURT REPORTER

### P.O. BOX 10195

### TALLAHASSEE, FLORIDA 32302-2195

### (904) 224-7642

1  BY MR. KIRWIN:

2  Q    Bought some cocaine from him at that time?

3  A    Yes, sir.

4  Q    All right.  And what did you do with that cocaine?

5  A    That cocaine I also took to Savannah.

6  Q    All right.  And was it powder cocaine or crack cocaine?

7  A    It was powder cocaine.  Later on it was turned into crack.

8         THE COURT:  Whose club was that?

9         THE WITNESS:  Jano, the guy that's on the picture.

10        THE COURT:  Okay.

11     (Pause)

12  BY MR. KIRWIN:

13  Q    Okay.  Now, you mentioned that on a number of occasions

14  you would call Marlin if you needed drugs.  Why would you call

15  Marlin if you needed drugs?

16  A    Well, Marlin, you know, he been selling drugs from a young

17  age, and so if I needed drugs, he know peoples in Fort

18  Lauderdale.  I wasn't down in Fort Lauderdale, so I wasn't

19  too -- I had lost a lot of contacts because I had moved to

20  Savannah.  Since he was down in Fort Lauderdale a lot more

21  than I was, I figure I could call him, I know him, I can call

22  him and come down there, I go down and I get drugs.

23  Q    Okay.  And can you give us an estimate of how many times

24  that you would hook up or that you did hook up with Marlin to

25  purchase drugs?

1 A    I -- I really can't say the amount of times because it was

2 a lot of times, but I imagine about eight, nine times,

3 something like that.

4 Q    Now, how would you get the -- would you be buying this

5 directly from Marlin or would he be brokering deals for you,

6 or how would that work?

7 A    Well.  It wouldn't be directly from Marlin.  It would be

8 like a broker.  I would go to Marlin, and Marlin would go to

9 Willie Moses, and Willie Moses would give Marlin the drugs,

10 and Marlin would bring the drugs back to me.  But Willie

11 Moses, he sold just crack, he didn't sell powder cocaine.  It

12 was just strictly crack.

13 Q    Did you ever buy directly from Marlin?

14 A    Yes, sir, I bought from Marlin a couple of times when he

15 come by selling drugs.

16 Q    Excuse me?

17 A    Yes, sir.

18 Q    Okay.  And those are directly hand-to-hand from you to

19 Marlin?

20 A    Yes, sir.

21 Q    And what type of drugs were you buying from him?

22 A    Same thing, crack cocaine.

23 Q    All right.  Now, you testified earlier you had met the

24 other defendant, Emerson Davis, or Mercy, through Marlin.  Do

25 you remember when that happened?

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


THE UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                      TALLAHASSEE CRIMINAL
                                         92-04013
EMERSON O. DAVIS,
    a/k/a Mercy,
    a/k/a John Calvin,
    a/k/a Dred,
    a/k/a Stanford Robinson, and
MARLIN DAVIS,
    a/k/a Marlin Oliver,
    a/k/a Boliver D. Oliver,      
    a/k/a Marlin Dalton,
    a/k/a Dalton Oliver,
    a/k/a Darryl Dalton

        Defendants.
_____/


## TRANSCRIPT OF SEVENTH DAY OF TRIAL


      The above-entitled matter came on to be heard before

the Honorable WILLIAM STAFFORD, United States District Judge,

in the United States Courthouse, Tallahassee, Florida, on the

6th day of March, 1996, commencing at 8:59 a.m.


# W. PAUL RAYBORN

## UNITED STATES COURT REPORTER

### P.O. BOX 10195

### TALLAHASSEE, FLORIDA 32302-2195

### (904) 224-7642

Smith - Direct                                                      178

1  Q    All right.   This -- this next trip to Wadley, what

2  happened on that trip?

3  A    We went up, we stopped by --

4            THE COURT:   Who is "we," now?

5            THE WITNESS:   Michael Morgan, Patricia Clarke,

6  Michelle Kennedy.

7  A    We went up, we stopped by Marlin Davis' trailer.  At the

8  time he was given an ounce of crack cocaine by Michael Morgan.

9  I think we stayed about two days, if I'm not mistaken, to make

10 the contact in the next town who Patricia was really going to

11 see in Waynesboro, Georgia.

12 BY MR. KIRWIN:

13 Q    Okay.   And what was that person's name?

14 A    Randy Lewis.

15 Q    Now, during this period of time you were just talking

16 about on these trips to Wadley, did the source of cocaine ever

17 differ, the cocaine that you took up to -- to Wadley?

18 A    Yes.   On that trip, the trip I returned with Patricia,

19 there was a kilogram quantity of cocaine involved at that

20 time.

21 Q    Okay.   The second trip up there?

22 A    Yes.

23 Q    And you just left part of that at Wadley and then took the

24 rest somewhere else?

25 A    Yes.



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


THE UNITED STATES OF AMERICA,

        Plaintiff,

vs.

EMERSON O. DAVIS,
    a/k/a Mercy,
    a/k/a John Calvin,
    a/k/a Dred,
    a/k/a Stanford Robinson, and
MARLIN DAVIS,
    a/k/a Marlin Oliver,
    a/k/a Boliver D. Oliver,
    a/k/a Marlin Dalton,
    a/k/a Dalton Oliver,
    a/k/a Darryl Dalton

        Defendants.

_____/

TALLAHASSEE CRIMINAL
92-04013




TRANSCRIPT OF EIGHTH DAY OF TRIAL


    The above-entitled matter came on to be heard before

the Honorable WILLIAM STAFFORD, United States District Judge,

in the United States Courthouse, Tallahassee, Florida, on the

7th day of March, 1996, commencing at 8:56 a.m.


# W. PAUL RAYBORN

## UNITED STATES COURT REPORTER

P.O. BOX 10195

TALLAHASSEE, FLORIDA 32302-2195

(904) 224-7642

Carswell - Direct

1  time you went into jail and came out, the time you were in

2  jail up there -- and that was in Wadley, wasn't it?

3  A   Yes, Louisville, Georgia.

4  Q   Louisville?

5  A   (Nodded affirmatively)

6  Q   Before you went into jail for that period of time, did you

7  make any trips to Fort Lauderdale with Marlin Davis?

8  A   Yes.

9  Q   How many trips do you think you made?

10  A   Two.

11  Q   What was the purpose of those trips?

12  A   To -- we were going to get some dope.

13  Q   And where did you go when you got down to Fort Lauderdale?

14  A   To a motel.

15  Q   Do you remember the name of the motel?

16  A   No.

17  Q   How long would y'all -- who was with you?

18  A   Me, Marlin and Diane.

19  Q   And how long would y'all stay?

20  A   Maybe a day or two.

21  Q   And did you purchase drugs down there?

22  A   No.

23  Q   Do you know whether or not Marlin did?

24  A   Yes.

25  Q   How do you know that he did?